UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
WARREN SANDS,

                 Plaintiff,             <u>MEMORANDUM & ORDER</u>
                                                   08-CV-0182(JS)(WDW)
       -against-

MANHATTAN BEER DISTRIBUTORS, INC.,

                 Defendants.
----------------------------------X
APPEARANCES:
For Plaintiff:        Warren Sands, <u>pro</u> <u>se</u>
                    268 Atlantic St.
                    Central Islip, NY 11722

For Defendant:        Amy J. Traub, Esq.
                    Eric B. Topel, Esq.
                    Jennifer Loren Whitney, Esq.
                    Epstein Becker & Green, P.C.
                    250 Park Avenue
                    New York, NY 10177


SEYBERT, District Judge:

        Plaintiff Warren Sands, <u>pro</u> <u>se</u>, commenced this action claiming violations of Title VII and the New York State Human Rights Law ("NYSHRL"). Plaintiff alleges that Defendant Manhattan Beer Distributor LLC, erroneously named in the Complaint as "Manhattan Beer Distributor, Inc.," subjected him to discriminatory employment practices on account of his race. Defendant has moved for summary judgment. For the reasons stated below, Defendant's motion is GRANTED.

BACKGROUND

On April 23, 1998 Defendant Manhattan Beer Distributor
LLC ("MBD") hired Plaintiff as a forklift operator at its
facility in Wyandanch, New York, at a wage of seven dollars per
hour. Def. 56.1 ¶ 5. Three years later, on April 23, 2001,
MBD's Vice President of Operations, Sal Rossi, who is white,
promoted Plaintiff, who is black, to the position of Night
Loading Department Supervisor at Wyandanch. Id. ¶ 7.
Accompanying this promotion was a raise to $39,000 per year.
Id. ¶ 10. On January 7, 2002, Rossi initiated another raise for
Plaintiff, to $41,000 per year. Id. ¶ 11.

Plaintiff further rose through the ranks at MBD when,
on July 21, 2002, Rossi again promoted him, this time to the
position of Assistant Manager, with a salary of $46,500 per
year. Id. ¶ 14. On December 9, 2002, Wyandanch Facility
Manager Tony Wetherell, also white, initiated another raise,
which Rossi approved, to $52,000 per year. Id. ¶ 15. On
January 6, 2003, and then on February 1, 2004, Wetherell and
Rossi were responsible for raises for Plaintiff to $53,500 and
$55,105 per year. Id. ¶¶ 17-18.

During this period, the Night Warehouse Manager
position at the Wyandanch facility went vacant, and Plaintiff
became Interim Night Warehouse Manager. At the end of a seven
month period, however, MBD elevated a white co-worker, Vinnie

2

DeLucia, rather than Plaintiff, to the permanent Night Warehouse Manager position. See Compl. ¶ 3. Also around this time, Plaintiff had a series of altercations with a white subordinate, Ed Duffy, who was belligerent and physically threatening toward Plaintiff. Although Plaintiff reported Duffy's behavior to Wetherell and Larry Cocozza, Defendant's Warehouse Manager, they took no corrective action. See Pl. Dep. Tr. 161-72. Duffy's conduct was never overtly racist, nor did Plaintiff express that the conduct was racially motivated in his complaints to superiors. Id.

As a result of these altercations, Plaintiff sought a transfer to MBD's Brooklyn facility, which he received on May 3, 2004. At the Brooklyn facility, Plaintiff continued in the position of Assistant Manager and his salary and benefits remained at their Wyandanch level until an additional increase to $56,758.15 per year, initiated by the Brooklyn Facility Manager and approved by Rossi. See Def. 56.1 ¶¶ 20-26.

On September 18, 2005, Rossi transferred Plaintiff back to Wyandanch, with a promotion to Night Warehouse Manager, reporting to Cocozza. Id. ¶¶ 27-28. Accompanying this promotion was a raise in salary to $61,000 per year. Id. ¶ 29. As Night Warehouse Manager, Plaintiff's job responsibilities included training and development of subordinates, providing leadership and guidance to ensure productivity and efficiency,

3

and preventing inventory loss. Id. ¶¶ 30. MBD maintained security guards at Wyandanch, but did not have a camera system installed. See Pl. Br. 27.

On January 3, 2006, Rossi called a meeting at Wyandanch with the facility's managers. Rossi was concerned over an inventory shortfall of roughly 30 pallets of Corona beer, representing some 1,350 cases and roughly $35,000 in revenue. Def. 56.1 ¶ 41. At the meeting, Rossi expressed his dissatisfaction over the missing inventory and made clear to everyone present that their jobs were on the line. Id. ¶¶ 41-43. At the meeting, and in a conversation with Rossi afterward, Plaintiff attempted to explain that the beer was not, in fact, missing. See Pl. Br. 9. Rather, Plaintiff had, in anticipation of certain peak months, begun fashioning pallets with more than the usual number of cases. Id. The effect of these larger pallets was that fewer pallets held the same quantity of beer. Id. MBD's inventory staff, however, continued counting inventory by pallet; without adjusting their count to reflect that certain pallets contained more beer. Id.

Two other incidents occurred following Plaintiff's return to the Wyandanch facility. In late September 2005, Cocozza required Plaintiff to perform the "transfer" work[1] of Ed

---

[1] This process, apparently, involved intra-facility transportation of inventory. Dep. 187-88.

Duffy, who worked the shift before Plaintiff's. Pl. Dep. Tr. at 190-91. Also, in April of 2006, following criticism by Plaintiff about the operation of the facility, Wetherell called Plaintiff into his office and threatened to terminate him. Id. id. 192-193.

Starting in April of 2006, additional problems arose for Plaintiff when a recently hired white subordinate, Robert Scannello, did not satisfy Plaintiff's expectations. Plaintiff came under pressure from his superiors because Scannello kept making errors. Pl. 56.1 6. So when Scannello's 90-day probationary period neared an end, Plaintiff terminated him, believing he had the right to do so under his job description. Id. Rossi and other management, however, considered this action to violate company policy. Def. 56.1 ¶ 36. They overrode Plaintiff's decision and reinstated Scannello. Id. Scannello nevertheless resigned shortly afterward. Id. ¶ 38.

In August of 2006, Plaintiff's nephew, who also worked at MBD, told Plaintiff that he had heard rumors that a group of MBD employees, including one Peter Tomlin, were conspiring to steal beer from the Wyandanch facility. Id. ¶ 47. Three weeks later, a truck driver at the facility also informed Plaintiff of an upcoming theft. Id. ¶ 48. Both times Plaintiff heard about the plot, he informed Cocozza. Pl. Dep. Tr. 129-31. But management took no preventative measures. Id. On September 28,

2006, while Plaintiff was on duty, Tomlin and others stole 218 cases of beer from an unlocked delivery truck. Def. 56.1 ¶ 50.

MBD launched an investigation. In an ensuing conversation with senior management, Plaintiff admitted that he never locked the delivery trucks after loading. Pl. Dep. Tr. 128. Plaintiff did this because problems with keys led to numerous complaints from drivers. Id. at 129. Plaintiff also admitted that, on the night of the theft, he had been less vigilant because Tomlin was on leave following a car accident. Id. at 132. Several days later, Plaintiff reported to management that Tomlin, who is black, and two other employees, one black and one Hispanic, all of whom were his direct reports on the night of the theft, had stolen the beer. MBD eventually terminated these employees. See Def. 56.1 ¶ 56.

On October 27, 2006, Rossi terminated all of the managers who were on duty on the night of September 28. Id. ¶ 58. This included three managers who had no involvement in the theft: Plaintiff, who is black; Greg Milau, the Assistant Night Manager, who is white; and Darrin Hatwood, a Supervisor, who is black. Id. ¶ 64. Rossi made the decision to terminate these managers, based on his belief that the Company no longer had confidence in their ability to manage. Rossi Decl. ¶¶ 44-47.

On December 19, 2006, Plaintiff filed a charge with the New York State Division of Human Rights (the "NYSDHR") and

the Equal Employment Opportunity Commission (the "EEOC"), charging MBD with racial discrimination in violation of New York law. On September 28, 2007, the NYSDHR issued a report indicating that there was no probable cause to believe that MBD had unlawfully discriminated against Plaintiff. On October 17, 2007, the EEOC adopted the findings of the NYSDHR and dismissed Plaintiff's charge. See Pl. Br. 11.

On January 14, 2008, Plaintiff, pro se, filed this action. Plaintiff claims that he was discriminated against on the basis of his race when MBD management promoted DeLucia over him, did nothing about Duffy's conduct, made him perform Duffy's work, reinstated Scannello, threatened to terminate him for his criticism of Wyandanch operations, and terminated him unfairly following the theft.

DISCUSSION

## I. Summary Judgment Standard

"Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law." Harvis Trien & Beck, P.C. v. Fed. Home Loan Mortgage Corp. (In re Blackwood Assocs., L.P.), 153 F.3d 61, 67 (2d Cir. 1998) (citing Fed. R. Civ. P. 56(c)); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986);

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

"The burden of showing the absence of any genuine dispute as to a material fact rests on the party seeking summary judgment." McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997); see also Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970). "In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." McLee, 109 F.3d at 134.

"Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact, once such a showing is made, the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Anderson, 477 U.S. at 256). "Mere conclusory allegations or denials will not suffice." William v. Smith, 781 F.2d 319, 323 (2d Cir. 1986).

In discrimination claims brought under Title VII and the NYSHRL, the burden-shifting framework established by the Supreme Court in McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), applies. See Ferraro

8

v. Kellwood Co. 440 F.3d 96, 99-100 (2d Cir. 2006).  That framework requires a plaintiff in a discrimination case to establish a _prima_ _facie_ case of discrimination, after which the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action in question.  _Id._ at 100.  Once the defendant provides such a reason, the plaintiff must show "sufficient potential proof for a reasonable jury to find the proffered legitimate reason merely a pretext" for discrimination.  _Id._ (internal citations and quotations omitted).

To establish a _prima_ _facie_ case of racial discrimination, Plaintiff must show: 1) he belonged to a protected class; 2) he was qualified for the position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent.  Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003).

## II.  Plaintiff Waived His Right To Bring NYSHRL Claims

Under the NYSHRL, plaintiffs have a choice.  They can file a complaint with the New York State Division of Human Rights, or seek relief in court.  They cannot, however, do both.  See N.Y. Exec. Law § 297(9).  Here, before filing this action, Plaintiff filed a complaint before the New York State Division of Human Rights.  See generally Compl.  Thus, under § 297(9),

Plaintiff waived his right to bring NYSHRL claims in this Court. Consequently, the Court awards Defendant summary judgment on Plaintiff's NYSHRL claims, without reaching their merits. <u>See Whidbee v. Garzarelli Food Specialties, Inc.</u>, 223 F.3d 62, 75 (2d Cir. 2000); <u>Blackmon v. Unite!</u>, 03-CV-9214, 2005 WL 2038482, at *15 (S.D.N.Y. 2005).

III. <u>Plaintiff's Title VII Adverse Action Claims</u>

Construed liberally, Plaintiff predicates his adverse action discrimination claims on the following discrete incidents: (1) in 2004, Defendant failed to promote him to the Wyandanch Night Manager position, and promoted a white person instead; (2) also in 2004, Defendant constructively forced him to transfer to the Brooklyn facility, by not stopping another employee's hostile conduct toward him; (3) in September 2005, Defendant forced him to do work that another employee should have done; (4) in April 2006, Defendant threatened to terminate him for his criticism about how the facility operated; (5) in the summer of 2006, Defendant reinstated an employee that Plaintiff fired; and (5) in October 2006, Defendant fired Plaintiff.

A. <u>Limitations Period</u>

Plaintiffs filing Title VII claims based on conduct occurring in New York must file a charge of discrimination with the EEOC or the NYSDHR within 300 days of the alleged

discriminatory action(s).  See 42 U.S.C. § 2000e-5(e)(1); Davis

v. Columbia Univ., 09-CV-9581, 2010 U.S. Dist. LEXIS 51802, at

*6 (S.D.N.Y. May 25, 2010).  Here, Plaintiff filed a charge of

discrimination with the NYSDHR on December 19, 2006.  See

generally Compl.  It follows then that Plaintiff's

discriminatory practice claims based on conduct that occurred

before February 22, 2006 are time barred – specifically: (1) his

2004 failure to promote claim; (2) his 2004 claim stemming from

his transfer to Brooklyn; and (3) his September 2005 claim

concerning being forced to do another employee's work.[2]  So the

Court considers only the following discriminatory practice

claims on their merits: (4) the April 2006 threat; (5) the

summer 2006 reinstatement of an employee that Plaintiff fired;

and (5) Plaintiff's October 2006 termination.

    B.    The Threat

        Plaintiff alleges that, in April 2006, he told

Cocozza, Defendant's Warehouse Manager, "how the facility was to

operate."  Compl. ¶ 7.  In response, Wyandanch Facility Manager

Tony Wetherell threatened to terminate him.

        It is debatable, at best, whether this threat

constitutes an adverse employment action under Title VII.  But,

---

[2]  This Court may consider these discrete acts, even though
individually time barred, in the context of Plaintiff's hostile
environment claim.  National R.R. Passenger Corp. v. Morgan, 536
U.S. 101, 115, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002).

assuming it does, Plaintiff has failed to establish a <u>prima</u> <u>facie</u> case of discrimination. The fourth prong of the <u>prima</u> <u>facie</u> case requires Plaintiff to show that "the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." <u>Terry</u>, 336 F.3d at 138. Here, nothing on the face of the threat suggests any racial animus. Rather, at most, it suggests only that Wetherell didn't like Plaintiff, the Night Manager, telling Cocozzo, the Warehouse Manager, how to do his job. And Plaintiff provides only his conclusory, unsupported belief that Wetherell threatened him because of racial motives. So Plaintiff's claims based on this threat cannot survive summary judgment.

  C.  <u>Scannello's Reinstatement</u>

    Plaintiff's claims concerning Scannello's reinstatement also fail. Except for hostile work environment claims, Plaintiff can seek Title VII relief only for adverse employment actions. An adverse employment action is "a materially adverse change in the terms and conditions of employment." <u>Mathirampuzha v. Potter</u>, 548 F.3d 70, 78 (2d Cir. 2008). Here, Plaintiff does not allege, much less evidence, that Scannello's reinstatement affected "the terms and conditions" of Plaintiff's employment in any way. Thus, Plaintiff's claims based on Scannello's reinstatement also cannot survive summary judgment.

D.  Plaintiff's Termination

Finally, Plaintiff alleges discriminatory termination. Again, it is debatable, at best, whether Plaintiff even meets his prima facie case of discrimination with respect to this claim.  Defendant fired all managers on duty during the theft, including one white employee.  So it unclear how Plaintiff's termination "giv[es] rise to an inference of discriminatory intent."  Terry, 336 F.3d at 138.

But even if it somehow does, Defendant has asserted a legitimate non-discriminatory reason for Plaintiff's termination: the theft caused it to lose confidence in his ability as a manager.  See Rossi Dec. ¶ 44.  And Plaintiff has failed to show that this reason was a pretext.  Indeed, Plaintiff provides nothing to suggest that the theft, and Defendant's resulting loss of confidence in his ability, were not the real reasons for his termination.  Rather, at most, Plaintiff claims that Defendant bore some responsibility for the theft, because it failed to install security cameras.  But that only goes to whether Plaintiff's termination was fair, not whether it was discriminatory.  And Title VII does not permit the Court to "second guess" an employer's unfair but non-discriminatory business decisions.  Stern v. Trustees of Columbia Univ., 131 F.3d 305, 311 (2d Cir. 1997).

IV. Hostile Environment Claims

In his response to Defendant's motion papers, Plaintiff recast his action as one seeking relief for a hostile work environment. See Pl. Resp. 4. Defendant argues that consideration of this claim is improper, because Plaintiff did not raise it in his Complaint. See Def. Reply 3-4.

It is generally "inappropriate to raise new claims for the first time in submissions in opposition to a summary judgment motion." Thomas v. Egan, 1 Fed. App'x 52, 54 (2d Cir. 2001). But, even if the Court permitted Plaintiff to constructively amend his Complaint to add a hostile work environment claim, such a claim would fail on its merits.

As an initial matter, a Title VII hostile work environment claim requires Plaintiff to demonstrate that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993) (internal quotations and citations omitted). Here, Plaintiff provides little or no evidence of such an environment. Rather, at most, Plaintiff alleges that he had a few disputes with a co-worker in 2004, and that this led to him choosing to transfer to the Brooklyn facility. Pl. Dep. Tr. 160-167. And Plaintiff

then alleges a few sporadic disagreements with co-workers in 2005 and 2006.

But even if these sporadic incidents somehow amounted to an abusive work environment, none of them were expressly racial in nature. And Plaintiff provides no evidence to suggest any racial motive behind his co-workers' conduct towards him. Alfano v. Costello, 294 F.3d 365, 378 (2d Cir. 2002) ("[f]acially [race-]neutral incidents" may be considered in a hostile work environment claim only if "a reasonable fact-finder could conclude that they were, in fact, based on [race]," which "requires some circumstantial or other basis for inferring that incidents [race]-neutral on their face were in fact discriminatory"). Instead, Plaintiff merely asks the Court to speculate that the conduct was racial, because he is black and his co-workers are white. But a "non-moving party may not rely on conclusory allegations or unsubstantiated speculation" to withstand a motion for summary judgment. See Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 101 (2d Cir. 2001). So Plaintiff's purported hostile work environment claim also cannot survive summary judgment.

<u>CONCLUSION</u>

For the reasons stated above, Defendant's motion for summary judgment, pursuant to F<small>ED</small>. R. C<small>IV</small>. P. 56, is GRANTED.  The Clerk of the Court is directed to mark this matter as CLOSED.


                              SO ORDERED

                              <u>/s/ JOANNA SEYBERT</u>
                              Joanna Seybert, U.S.D.J.

Dated:     Central Islip, New York
           September 14, 2010